Nott J.
This unfortunate species of property is constantly presenting us with cases involving considerations of policy rather than law, and in which little assistance can be derived from authority.
Slavery has existed in almost all countries and in almost all ages of the world.
It existed among the Jews, God’s chosen people, and was sactioned by divine authority.
It has existed in England, in a more abject state than was ever allowed in this country Hallam in his History of the Middle Ages, says, «in England it was very common, even after the conquest to export slaves to Ireland, (2 Vol. 263.) Another writer accuses the Anglo-Saxon nobility of selling their female servants, even when pregnant by them, as slaves to foreigners. And a third says, that the English, before the conquest, were generally in the habit of selling their children and other relations to be slaves in Ireland, without having even the pretext of distress or famine; (Do. in notes.) Villeinage, as it was called in England, was only another name for A villein could not hold property; he *402 had no civil rights, except what was allowed by his master, (2 Blackstone, Comm. 934. 1 Hallam 120-2-3-4. 2nd Do. 198,206.)
In Rome, slaves were not less subject to the absolute and despotic will of theii? masters. Atone time, the master h ó the power oí life and death over hem. (Adams’ Antiquities 37.)
It is, from those two sources, the'common and the civil law, if any where, that we are to derive the principles by which questions of this sort aré to be governed. But, altho* we ca . asceitaiu that slavery actually existed in both those countries, yet such was the different situations of their slaves at different periods, that it is not easy to trace the reciprocal duties and liabilities of master and servant: (vide Reeves’ H. Eng. Law. 99.) Even if the task were less difficult, the condition was so different from that of our slaves, that we should profit but little by the research.
. In England a villein had all the privelege of a freeman in respect to all persons except his master. He might maintain actions for personal injuries, and although he might defend himself by a plea of villeinage v> an action brought against him, 1 do not fin'd it any where laid down, that his master was liable for damages resulting to another on account of his trespasses or negligence.
By the civil law, a person was allowed what was called actio noxatis by which a master was made liable for any damage done to another by his slave, such as theft, robbery or any other damage, But he was equally liable for any damage done by his horses, cattle or other animals. He might, however, relieve himself from liability in either case bv delivering up the slave or animal to the party injured and was not held answerable for more than his value: ( ooper’s Justinian 354. 357,passim. 1 Domut 305.) Puffendorf recognizes the correctness of this principle, (book 3. page 6.) The ground of liability according to this author is, that the slave, if free, would have been answerable for *403 Ms own act, and the beast in a state of nature would be subject to the will of the injured part: The master therefore, by enslaving the one and domesticating the other, became liable to the extent of their value. Some such notion as this, it seems to be thought by some writers gave rise to the doctrine of deodand which condemned even the instrument by which death was occasioned, to expiate the offence it had committed. Grotius, however, differs in opinion from Puffendorff; he thinks the master not liablefor the act of his servant or beast; but Harbeyrac in his notes, on that author takes a middle course: he thiitlcs the master ought to be answerable for the acts of his slave, but not for those of his beast. ( Grotius Lab. 2. c. 17. 375. yet in none of these cases does the extent of the liability seem to be very well defined.-
Even to this day, the doctrine of the common law, in relation to the subject does not appear to be very well settled. Judge Blackslone says, if a servant by his negligence does any damage to a stranger, the master shall answer for his neglect: Therefore; if a smith’s servant lame a horse while he is' shoeing him an action lies against the master. And upon this principle, says the same author, by the common law, if a servant kept his master’s fire negligently, so that his neigh-bour’s house was burned down, thereby, an action lay against the master, because the negligence happened in his service; otherwise if the servant going along the street with a torch sets fire to his neghbour’s house; for then he is not in his master’s immediate service; (1 Blackstone’s Com. 431.) The same doctrine is laid down in the same vague manner in Noys Maxims c. 44. p. 95.112, and in Doc and Student c. 42. p. 237. And each of these learned authors gives the otherfor authority. But that is too vague and general to constitute any definite rule of decision. In the case of M‘Manus vs. Cricket, 1 East. 106, it was decided after a review of all the cases upon the subject, that a master was not liable for a trespass committed by his servant.
*404 Judge Reeves in his treatise on Domestic Relations finds great fault with that decision. He says, there is no cl ¡fíe» rence with respect to the liability of the master between an injury arising from negligence and one occasioned by a diJ réct trespass or tort. And 1. am not prepared to say that 1 ató satisfied that there ought to be any such difference. Judge Reeves seems to consider it as a conceded point, that in England a.master is liable for the negligence of his servant. But I am not satisfied that that question is conclusively settled in England. Most of the cases relied on by that learned judge. Savignac vs. Roome, 6 D. & E. 125. Morley vs. Gaisford, 2 H. Blackcstone 442. Jones vs. Hart 2 Salk. 441. &. Day vs. Edwards, 5 D & E. 648, turned upon the nature of the actions. No question was made with regard to the liability of the master.
Among these confiicting opinions then, we may at least feel ourselves untramelled by authority, if the English decisions could be considered authority on such a question. The importance, however, of this question is not diminished on-that account. It .is, therefore, satisfactory to find that we have a decision of our own directly in point. The case of Snee & Trice, 2 Bay, p. 345 depended upon the same principle as the case now under consideration: in that case the defendant’s negroes had suffered a fire to break out from the field; where they were at work and to burn up the plaintiff’s crib of. corn. The court held that the defendant, was not liable for the negligence, of his servants. The question was decided, upon general principles and not upon the .particular circumstances of the case. Whether the result ot the neglect be the. burning of a corn crib, or the breaking of a cart, the principle must-be the same. That case has always been received as. law, and it would now be unwise to innovate upon a principle which has been so long established. Tradesmen, ferrymen,-, carriers, and others acting in such like capacities are ex-, ceptions to the rule. In those cases, the master by inviting •rvihavs to repose a confidence in them, becomes security fot *405 the faithful performance of their duty and must be answerable for their neglect. Judge Blackstone in illustrating the principle as laid down by him,. (T vol.p. 431,) which has already been alluded to, gives the instance of a smith who lames a horse by shoeing. And if that is the whole extent to which the doctrine is carried in England, then are our decisions conformable to the law of that country. Particular cases of hardship may grow out of the law as thus settled: But we cannot forsee. the extent of the liability which-would spring from, a contrary doctrine. The decision appears to be founded upon the policy of the country, and I am disposed to think it correct. It is at least one, on which it would be dangerous to be trying, experiments. The interest of the master affords a higher security against misconduct or negligence of his servants than any liability which the law could impose. >
Jlscson & Grimke', for appellants.
Eckhard & Toomer, contra.
I am of opinion, therefore, that a; new. trial ought to be granted.

) See Croft vs. Alison, 4 Barnwell, and Ald. 590. and Weylands, vs. Elkins, 1 Holt’s Rep. 227. To thelatter case a note of cases is added by the Reporter. • It appears from the following extract that, by the laws of Rome, before the time of Justinian, the condition of the master could not be rendered worse by the act of his slave.
‘■‘¡Ejus bona, qui falsam monetam-fiercussisse- dicitur, fisco vin-dicantur. Quo.d si serví ignorante domini id fecisse dicantur, ifisi quidem summo sujiplicio afjiciuntur; domino -tamen nihil aufertur, quiajiejorem domini cau&am - semi facere, nisi forte scieret, omnino non jiossunt. Julius Paulus, de Juré isci et jiopuli. See Schul-tgngius Jurisfirud. Vet. Anti Justin. — 481.
At a very early period, even before the arrival of the Saxons, we find.that slavery existed in England. (Strab, l. -4.) though indeed according to Csesar the lower classes were not much above the condition of slaves. (B.. G. L. 6. c. 13.)
A very large proportion of the Anglo Saxon population was-in a state of slavery. (Bigland’s history of England, .lst-vol. 7S.J The higher classes seized on the poor and indigent and reduced them and' *406 their infants to slavery; and not only sold women in a state of pregnancy, but as the author of the life of Wolfstan, Bishop of Worcester, says “ got them with child that they might bring a better price,’' (Anglia Sacra. T. P. 285. Turner’s history of the Anglo Sax, vol. 3. chap. 9, n. Hen. History Great Britain, vol. 4, 238.) They were sold in Rome, Ireland, France and other countries. See Bigland’s, Hume’s, and Henry’s Histories of Eng. Turner’s, Anglo Sax. &c. We also, know from the celebrated story of the English slaves in the market at Rome from Bede and repeated by all the English Historians, that the holy father the Pope permitted this traffic. — Slaves were allowed to be whipped, put in borids, branded, &c. and on one occasion are spoken of as yoked. Let every man know his teams of men, of horses and oxen.” (Wilkins Leg. Sax. cited by Turner, vol. 1.) A French Historian states that this was the case with the greater part of the peasantry in the time of Louis XI. who died in 1483. (P. de Bussieres, Soc. Jcs. Hist. France, l. 11.) And in our own day a Frenchman says “I recollect to have seen in France, that land of gallantry, a woman and an ass harnessed, together to the same plough, and the tattered peasant behind stimulating- his team with a seemingly impartial whip. (Travels of a Frenchman, Simonde. vol. 1st, p. 274.)
Anglo Saxon Freemen, were frequently servants, and had their masters, as may be shown by the ancient English legal collec-' tions. K If any man give flesh to his servants on fast days, whether they be free or servile, he must compensate for the pillory.” Leg. Wihtraed. So in the laws of Ina-, if a freeman work on Sunday Without his .lord’s orders, he. shall lose his liberty or pay sixty shillings.
Wives must have been regarded in some measure as slaves, for for we see frequent mention of the purchase of them: In the laws of Ethelbert the first Christian, King of Kent it is laid down, “ If a man buy a maid with his money let her stand for bought, if there be no fraud in the bargain; but if there be, let her be returned home, and the purchase money restored.” Which law, no doubt, was founded on the civil law doctrine that a sound price deserves a sound commodity.
• It is supposed that the number of slaves was rather increased than diminished by the Norinan conquest. Four different classes are enumerated by the authors of that period.
- 1st. Villeins (i. e. villagers) in gross, who were the personal propei-ty of their masters.
2nd. Villeins regardant, or predial slaves annexed to the land,. adscrifititii gleba, and were sold with it. They were pretty much the same as those mentioned by Tacitus, among the Germans. {He Mori', Germ. J
*407 Brel. Cottars, who were men that had been instructed by order of their masters in some trade or art; as that of smiths, carpenters, See. and were in every respect on the same footing with villeins or predial slaves.
4th. Borders, whose condition is not distinctly ascertained, but most probably were a kind of upper domestic servants. (Henry’s Great Britain, 6 vol. 3. S.J
The Norman conquerors, for some time, treated their English slaves with so much severity, that a cotempory writer, in the collection of Gale, cited by Hem-y, declines giving any description of it; because its inhuman cruelty would appear incredible to posterity.”
Much information as to the state of slavery in the time of Richard Coeur de Lion, is to be found in the novel of Ivanhoe.
The great charters of Henry III. place the offence of destroying men and goods on the same footing. (Blackstone’s Law Tracts.)
In the Annals of the Priory of St. Dunstan, is the following «nti-y, “A. D, 1283: This year in the month of July we sold our slave Wm. Pyke, and received one mark of the bnyer.” As Dr. Henry observes, if one mark was the whole of his price, men must have been cheaper than horses, orPykc must hove been a worthless fellow.
By the-statute 1st. Bdw. 6th. cha/i. 3rd, A. D. 1547, it was ordained that all idle vagabonds should be made slaves and fed on bread and water or small drink and refuse meat, should wear a ring of iron round their necks, arms, or legs, and should be compelled, by beating, chaining, or otherwise, to perform the work assigned them, were it ever so vile. (Stat. at Large, S vol. Pickering’s Ld. Blackst. Com. 1 vol. 14th c. Jac. Law Die. — Slaves. J In the same reign Sir Thomas Smith, who was Secretary of State to the king, observes that he never knew of any villeins in gross in his time, and that villeins ap-pendant to manors (villeins regardant: glebse adscriptitiiJ were but few in number: that since England had received the Christian religion, men began to be affected in their consciences at holding their brethren in servitude; and that upon this scruple in process of time, the holy fathers, monks and friars, so bnrthened the minds of those they confessed, that'temporal men were glad to manumit all their villeins. But he adds, the holy fathers themselves did not manumit their own slaves, and the bishops behaved like other ecclesiastics_But at last some bishops enfranchised their villeins for money, and others on account of popular outcry: and at length the monasteries, falling into lay hands, were the occasion that almost all the villeins in the kingdom were manumitted. ( Smith’s liepub. cited by Dr. Cooper in the notes of his edition of the Institutes of Justinian, 414. iiees Ancy-clopedia, Villein,
*408 'The reason given by Dr. Henry for the diminution of villeins was, that they had ceased to be profitable.
Villeinage was at last virtually abolished'by Statute 12, Car. 2. Rees Ency. Villein.
It would far exceed the limits of a note to point out the method by which men were reduced to slavery and manumitted, and their condition at various periods; suffice it to say that they were slaves in every senseof the word. — Raines Barrington in his observations on magna carta says that villeins who were held by servile tennures. were regarded as so many negroes on a sugar plantation.
It was held so late as 5 Wm. and Mary, A. D. 1693, that one might have property in a negro; because negroes are heathen, (1 Ld. Raymond, 147.) But it was decided 1772 in Somersetts case ft Eofft’s Refi. 1,) that even a heathen negro, when brought to England», is entitled to his freedom.
It is now the law in that country, that a slave so soon as he lands becomes free; but notwithstanding all their boast, the horribly prac-, tice of impressing seamen, is nothing more nor less than kidnapping and making them slaves.
Slaves are still held in large numbers in the English West India Islands: and the Reverend Society established in Great Britain for propagating the gospel in foreign parts, owned a plantation and negroes in Barbadoes in 1801, (Edward’s History West Ind, 2 vol.fi. 41.) ■
Negroes were first pointed out to his countrymen as an article of commerce by Alonzo Gonzales, a Portuguese; and in the course a few years no less than thirty seven ships were fitted out in this trade. The greatest dealers in this traffic, were the Spaniards, who having almost destroyed the natural inhabitants of Spanish America, supplied their places in working their mines, with negroes, so early as 1502. The Genoese undertook to furnish the Spaniards with negroes at a concerted price between them, and for this purpose formed the famous Assiento contract, which was afterwards successively transferred to Portugal, France and to England. The English yielded it to Spain in 1750, because they had been losers by the trade; and then they preached universal emancipation.
0 Cives, Gives, queerendapecunia firitnum
Virtue post nummos.—
See Edwards’ West Indies; Rees’ Ency. Assientoj Iñ/alsk’s Appeal,
John Hawkins, who sailed in 1562, is the first Englishman who is known to have engaged in this commerce. (Edw. West Ind,) See also Hakluyt’s Collection of Early Voyages, where there is a full account of Hawkins’s expedition,
*409 'Negroes were introduced into Virginia in 1620, and into Massachusetts and Connecticut in 1638. (Tucker Blackstone, 2 vol. note II. J They were probably brought into South Carolina at its first settlement in 1670, as we find that four years after,-they were owned by the governor, Sir John Yeamens, and his followers, who had brought them front Barbadoes. (Ramsay’s Hist. South Carolina, 1 voL 35.)
With regard to'the children of villeins, slaves &c. in the middle ages, the rule in France, and most nations on the continent was, that they should follow the condition of the mother. But the rale was the reverse in England. (Du Cange, Gloss, Med. et Inf. Lat. Servi.J But it appears from a citation from Bracton, in the notes to Hallam (1 yol. 232, of the Philadelphia Ed.) “ that the spurious issue of a nief, though by a free father, should be a villein, guia sequitur conditioneni matris, quasi vulgo conceptas. 1.1. c. 6. In South Carolina, the children follow the condition of the mother, (see Gayle vs. Cunningham, Harper's Eq. Rep. 124.) The English rule it appears was adopted even more extensively in St. Domingo; for all mulattoes became free at the age of twenty-four, until 1674, when by a royal edict the civil law doctrine was recognized. — ( Wimpffin’s St. Domingo, 61.)
The following curious case is reported in 3 Mod. 120.
“Sir Thomas Grantham bought a monster in the Indies, which was a man of that country, who had the perfect shape of a child growing out of his breast as an excrescency, all but the head. This man he brought hither, and exposed to the sight of the people for profit. The Indian turned Christian and was baptized, and was detained from his master.
The master brought a homine replegiando.
The sheriff returned that he had replevied the body, but did not say, the body in which Sir Thomas claimed a property; whereupon he was ordered to amend his return.
And then the court .of .common pleas bailed him.”
Since writing the abovenote, I have observed’that, the Louisiana Code, has adopted the civil law process, actio noxalis, (Code, TU. VI. ch. 3, Slaves. J